**STOKELY–VAN CAMP, INC.,**
**Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–**
**Appellee.**

**No. 91–5055.**

United States Court of Appeals,
Federal Circuit.

Sept. 9, 1992.

---

Robert H. Aland, Baker & McKenzie, of Chicago, Ill., argued for plaintiff-appellant. With him on the brief were Neal J. Block and Karen A. Kuenster.

Charles Bricker, Attorney, Dept. of Justice, of Washington, D.C., argued for defendant-appellee. With him on the brief were Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and Gilbert S. Rothenberg, Attorneys. Of counsel was Bruce R. Ellisen, Attorney, Dept. of Justice.

Before NEWMAN, ARCHER and MICHEL, Circuit Judges.

ARCHER, Circuit Judge.

Stokely–Van Camp, Inc. (SVC) appeals the November 2, 1990 summary judgment of the United States Claims Court holding that SVC is not entitled to income tax refunds for the years ending May 31, 1978 through May 31, 1982.[1] *Stokely–Van Camp, Inc. v. United States*, 21 Cl.Ct. 731 (1990). SVC contends that it is entitled to deduct commissions paid to its domestic international sales corporation (DISC), Stokely–Van Camp Overseas, Inc. (SVCO) and that part of the amount SVC paid to redeem stock is a deductible or amortizable cost. We affirm.

## BACKGROUND

SVC's primary business is the manufacture, marketing and distribution of high quality food products. During the years in issue, SVC's stock was held publicly, with the largest single shareholder owning approximately 11 percent of the outstanding shares of common stock. SVC's original federal income tax returns for taxable years 1978–82 were filed before the company was acquired by the Quaker Oats Company (Quaker) on October 31, 1983.

---

1. Since this case involves provisions of the Internal Revenue Code in effect in 1982, all references are to the 1954 Code, as amended, unless otherwise specified.

The issues involved in SVC's case came before the Claims Court on cross motions for summary judgment. Both parties agreed that there was no genuine issue as to any material fact, and that disposition by summary judgment was appropriate. The Claims Court granted the government's motions for summary judgment, thereby denying the tax refunds claimed by SVC.

## I.

A. Under the DISC provisions of the Internal Revenue Code (IRC), United States corporations engaged in export sales could defer the federal income taxes on a portion of the income from those sales through the use of a DISC. *See* IRC § 991–997 (1982). A DISC itself is not subject to tax, IRC § 991, but part of the income allocated to the DISC (in this case commission income) is taxed currently to the DISC's shareholders as though received as a dividend. The balance of the DISC's income is not taxed to the shareholders until distributed (or on the happening of certain events, such as when shareholders dispose of their stock or when the corporation ceases to qualify as a DISC). IRC § 995.

SVCO, a wholly-owned subsidiary of SVC at all times relevant for this case, elected DISC status under IRC § 992(b) and filed Form 4876 (Election To Be Treated as a DISC) on December 15, 1972, to be effective for its taxable year beginning January 1, 1973. For the taxable years 1977–1981 here at issue, SVCO timely filed annual returns as a DISC on Forms 1120–DISC. On its original returns, however, SVCO reported information that established it did no business as a DISC during that period. Before SVC was acquired by Quaker, SVC never claimed commission income payable to SVCO nor did SVCO report any such income.

On January 26, 1984, amended Forms 1120–DISC were filed for SVCO for the taxable years 1977 through 1981. In the amended returns, SVCO filed as a commission DISC and reported commission income from SVC. SVC filed corresponding amendments to its returns for its taxable years ending May 31, 1978 through 1980 on January 26, 1984, and for its taxable years ending May 31, 1981 and 1982 on February 10, 1984, claiming deductions for the commissions payable to SVCO. On February 28, 1984, Quaker sent $5,222,321 to SVCO to pay for SVC's "commission expenses" for the taxable years in issue.

■ B. Section 992(a) of the IRC establishes conditions for qualifying as a DISC. A DISC is defined in IRC § 992(a)(1). SVC concedes that SVCO does not qualify as a DISC under that section, but argues instead that SVCO qualifies under IRC § 992(a)(2) in conjunction with Treasury Regulation 26 C.F.R. § 1.992–1(g) (1982).

Section 992(a)(2) provides for the promulgation of regulations to deal with the status of a corporation which has filed a return as a DISC for a taxable year, but has failed to satisfy the requirements of IRC § 992(a)(1).

**(2) Status as DISC after having filed a return as a DISC.**

The Secretary shall prescribe regulations setting forth the conditions under and the extent to which a corporation which has filed a return as a DISC for a taxable year shall be treated as a DISC for such taxable year for all purposes of this title, notwithstanding the fact that the corporation has failed to satisfy the conditions of paragraph (1).

IRC § 992(a)(2). The authority given in section 992(a)(2) has been implemented by Reg. § 1.992–1(g).

(g) *Status as DISC after having filed return as a DISC.* Under section 992(a)(2), notwithstanding the failure of a corporation to meet the requirements of paragraph (a) of this section for a taxable year, such corporation will be treated as a DISC for purposes of the Code for such taxable year (and, thus, will not be able to claim that it is not eligible to be a DISC) if—

(1) Such corporation files a return as a DISC for such taxable year,

(2) Such corporation does not notify the district director, more than 30 days before the expiration of the period of

limitation (including extensions thereof) on assessment for underpayment of tax for such taxable year (as determined under section 6501 and the regulations thereunder), that it is not a DISC for such taxable year, and

(3) The Internal Revenue Service has not issued, within such period of limitation (including extensions thereof) on assessment for underpayment of tax for such taxable year, a notice of deficiency based on a determination that such corporation is not a DISC for such taxable year.

A corporation is treated as a DISC, for all purposes, pursuant to the provisions of this paragraph for any taxable year for which it meets the requirements of this paragraph, even if such corporation is an ineligible corporation described in paragraph (f) of this section for such taxable year. Thus, for example, a corporation which is treated as a DISC for a taxable year pursuant to this paragraph is treated as a DISC for that taxable year for purposes of § 1.992–2(e)(3) (relating to the termination of a DISC election if a corporation is not a DISC for each of any 5 consecutive taxable years). If a corporation is treated as a DISC for a taxable year pursuant to this paragraph, persons who held stock of such corporation at any time during such taxable year are treated, with respect to such stock, as holders of stock in a DISC for the period or periods during which they held such stock within such taxable year.

26 C.F.R. § 1.992–1(g) (1982).

SVC contends that under section 992(a)(2) and Reg. § 1.992–1(g) SVCO must be treated as a DISC "for all purposes" of the tax code for its 1977–1981 taxable years because SVCO (a) filed returns as a DISC for those years and (b) did not notify or receive notification from the IRS prior to the expiration of the statute of limitations for the assessment of a deficiency that it was not a DISC. If SVC's position is correct, it would be entitled to deduct for its 1978–1982 years the commissions paid to SVCO. SVC argues that its interpretation

is supported by the "plain meaning" of section 992(a)(2) and Reg. § 1.992–1(g).

SVC's position must fail, however, because it ignores the parenthetical language in the first paragraph of Reg. § 1.992–1(g), which states that a corporation satisfying the requirements of Reg. § 1.992–1(g) "will not be able to claim that it is *not eligible* to be a DISC." (Emphasis added.) Thus, Reg. § 1.992–1(g), when read in its entirety, applies only in those cases where a taxpayer, having previously filed a return as a DISC, seeks to avoid DISC status. This reading of the regulation is supported by the legislative history of section 992(a)(2) and by the changes that were made in the course of promulgating Reg. § 1.992–1(g).

Although SVC argues that the legislative history of section 992(a)(2) supports its interpretation, it quotes and relies on only a part of the relevant paragraph from the Senate and House Committee reports:

> The regulations would provide that in the case of a corporation which has not indicated more than 30 days before the running of the statute of limitations for the year that it is not a DISC and has filed a tax return as if it were a DISC, then the corporation ... is to be treated as if it were a DISC for the year in question, if the [IRS] has not issued a notice of deficiency based upon a determination that the corporation was not a DISC.

S.Rep. No. 437, 92d Cong., 1st Sess. 93–94 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1918, 1999–2000 and 1972–1 C.B. 559, 611; H.R.Rep. No. 533, 92d Cong., 1st Sess. 61 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1825, 1875 and 1972–1 C.B. 498, 530. The first sentence of that paragraph, however, states:

> In addition, provision is made for regulations to provide rules dealing with a corporation which has filed a return as a DISC and subsequently claims that it is not eligible for DISC status.

*Id.* Consistent with the text of Reg. § 1.992–1(g), the Senate and House reports show that IRC § 992(a)(2) was intended to cover only those situations where a taxpay-

er, after having claimed DISC status, seeks to avoid that status.

The regulatory history of Reg. § 1.992–1(g) also confirms this reading of the regulation. When Reg. § 1.992–1(g) was proposed initially, it did not contain the parenthetical language discussed above. *See* 37 Fed.Reg. 10,369 (1972). The reason for adding the parenthetical language, as explained in Treasury Decision 7323, was that Reg. § 1.992–1(g) was not intended as a relief measure for corporations that do not satisfy IRC § 992(a)(1). The Treasury Decision stated:

> Section 1.992–1(g), as proposed, is amended to indicate that the provision is not a relief measure. A corporation will generally be treated as a DISC only if it satisfies the requirements for qualification as a DISC. A corporation which fails (through inadvertence or otherwise) to meet all of those tests for a taxable year might, nonetheless, seek the benefits of being a DISC by filing a return as a DISC. It may later appear to the corporation that it is more beneficial not to be treated as a DISC for that year. If the conditions of § 1.992–1(g)(1), (2), and (3) are met, that corporation will not be able to avoid being treated as a DISC by reason of its failure to meet all the qualification requirements for the year.

T.D. 7323, 1974–2 C.B. 225, 226.

Because SVCO does not satisfy the requirements of IRC § 992(a)(1) to be a DISC and is not entitled by IRC § 992(a)(2) and Reg. § 1.992–1(g) to be treated as a DISC, we affirm the Claims Court's judgment denying DISC status to SVCO for the taxable years 1977–1981.

### II.

A. SVC's second ground for claiming a tax refund for its taxable years ending May 31, 1981 and 1982 relates to premiums

allegedly paid to three shareholders to redeem SVC's common stock. SVC argues that it is entitled under section 162(a) of the IRC to deduct the premiums as an ordinary and necessary business expense or, in the alternative, that it is entitled with respect to the premium paid to one of the shareholders to amortize and deduct that premium over a five year period under section 167(a) of the IRC.

During the 1970s and early 1980s, the book value of SVC's stock substantially exceeded its market selling price. In an effort to provide for future growth and to maximize the value of its stock, SVC adopted a long term corporate policy for redeployment of its assets. SVC's redeployment of assets program was in progress in taxable years 1981 and 1982. During those years, SVC had sold or was in the process of selling substantial assets, and had realized or was in the process of realizing significant amounts of cash that had not been reinvested or committed to reinvestment.

During 1978 and 1979, GDV, Inc. (GDV), a subsidiary of City Investing Company (City) purchased more than five percent of SVC's outstanding common stock. SVC's senior management believed that GDV's and City's acquisition activities, and the publicity about related administrative and legal proceedings, created an atmosphere that had an adverse effect on the company.

On April 28, 1981, SVC entered into an Agreement (the Agreement) with GDV and City under which SVC paid $5,338,200 to GDV. The Agreement provided that: (a) GDV would surrender SVC common stock to SVC; (b) GDV and City would terminate all outstanding litigation; and (c) GDV and City would not acquire any stock, evidence of indebtedness or other security of SVC for five years (standstill covenant).[2] No

---

**2.** The Agreement included the following premise:

> WHEREAS, Stokely, desires to purchase from GDV and GDV desires to sell to Stokely the Purchase Shares upon the terms and for the consideration set forth herein, *including settlement of the Actions among the parties hereto and City's and GDV's covenant not to*

*acquire, directly or indirectly, any interest in securities of Stokely on or prior to the fifth anniversary of this Agreement;* [emphasis in the original].

The Agreement further states:

> GDV and City covenant and agree that neither GDV nor City nor any of their respective subsidiaries or agents, nor, to the extent of

monetary amount was allocated specifically to the standstill covenant. Based on the average trading price of its shares on April 28, 1981, SVC states it paid a premium of at least $452,025 above the market value of its stock.

By May 1982, Central National Corporation (CNC) and certain other persons acting in concert with CNC (together, the CNC Group) had purchased 296,000 shares, or approximately nine percent, of SVC's outstanding common stock. Glickenhaus & Co. (Glickenhaus), a limited partnership, acting for itself and on behalf of the owners of certain of its discretionary accounts, had purchased 157,500 shares, or approximately five percent, of SVC's outstanding common stock. The CNC Group and Glickenhaus were acting in concert with respect to their acquisition of SVC's common stock. SVC's senior management viewed the acquisition actions of the CNC Group and Glickenhaus as a threat to the continuation of the redeployment of assets program and believed that such actions jeopardized SVC's assets and business operations.

On May 11, 1982, SVC entered into agreements to purchase the CNC Group's 296,000 shares of SVC's common stock for $10,656,000, and to purchase Glickenhaus' 157,500 shares of SVC's common stock for $5,670,000. The payments were made on May 18, 1982. Based on the average trading price of its shares on May 11, 1982, SVC states the CNC Group was paid a premium of at least $999,000 above the market value of its stock, and Glickenhaus was paid a premium of at least $531,562 above the market value.

On July 18, 1983, SVC announced its approval of Quaker's proposal to acquire all of SVC's outstanding common stock at $77 in cash per share.

B. SVC argues that it is entitled to deduct the premiums paid to GDV and CNC Group/Glickenhaus under section 162(a) because it redeemed the stock "in order to insure implementation of SVC's corporate redeployment of assets program for the benefit of SVC and its shareholders, protect SVC's existing goodwill, reputation and business operations and stop the disruptions to SVC's normal ongoing business operations." In so arguing, SVC relies on the purpose of the redemption as grounds for classifying the expenditure as a deductible expense.

■ The Supreme Court, however, has rejected the business purpose standard for determining whether an expenditure is ordinary or capital, and has instead adopted the "origin of the claim" test. See Woodward v. Commissioner, 397 U.S. 572, 577, 90 S.Ct. 1302, 1306, 25 L.Ed.2d 577 (1970); United States v. Hilton Hotels Corp., 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970). Under the origin of the claim test, if the origin of an expenditure is capital in nature (such as the acquisition, enhancement, or disposition of a capital asset), the expenditure is not deductible as an ordinary business expense, irrespective of the taxpayer's motivation for making the expenditure. See, Woodward, 397 U.S. 572, 90 S.Ct. 1302; Arkansas Best Corp. v. Commissioner, 485 U.S. 212, 223, 108 S.Ct. 971, 977, 99 L.Ed.2d 183 (1988) (taxpayer's motivation for purchasing an asset is irrelevant to determining whether the asset is a capital asset).

In Woodward, the taxpayer, who owned or controlled a majority of the common stock of an Iowa corporation, voted to extend the corporate charter, which was about to expire. A minority stockholder

their control, any of their respective parent companies, affiliates or controlling persons shall hereafter purchase or otherwise acquire, either beneficially or of record, directly or indirectly, either individually or jointly with, or through, one another or any other corporation, partnership, syndicate, venture, trust, estate or other person, any share or shares of the capital stock of Stokely or any evidence of indebtedness or any other security of Stokely, or enter into any contract, agreement or

understanding, written or verbal, with any other person regarding such acquisition of the capital stock of Stokely or any evidence of indebtedness or other security of Stokely at any time on or *prior to the fifth anniversary hereof,* provided, however, *that The Home Insurance Company, a subsidiary of City, shall be free to acquire shares of capital stock or indebtedness of Stokely in the normal course of investing funds for its portfolio.* [Emphasis in the original.]

voted against the extension of the corporate charter, and the taxpayer was forced by Iowa law to "purchase at its real value the stock voted against such renewal." *Woodward*, 397 U.S. at 573, 90 S.Ct. at 1304 (quoting Iowa Code § 491.25 (1966)). When no agreement could be reached on the "real value" of those shares, an appraisal litigation ensued, and the taxpayers paid $25,000 in professional fees for services rendered in connection with the litigation. *See Woodward*, 397 U.S. at 573–74, 90 S.Ct. at 1304.

The taxpayers in *Woodward* argued that it was wrong to include the appraisal expenses with the purchase price of the stock because the expenses were incurred involuntarily. The Court rejected this argument, stating:

> In the first place, the transaction is in a sense voluntary, since the majority holders know that under state law they will have to buy out any dissenters. More fundamentally, however, wherever a capital asset is transferred to a new owner in exchange for value either agreed upon or determined by law to be a fair *quid pro quo*, the payment itself is a capital expenditure, and there is no reason why the costs of determining the amount of that payment should be considered capital in the case of the negotiated price and yet considered deductible in the case of the price fixed by law. See *Isaac G. Johnson & Co. v. United States*, 149 F.2d 851 (C.A. 2d Cir.1945) (expenses of litigating amount of fair compensation in condemnation proceeding held capital expenditures).

*Woodward*, 397 U.S. at 579 n. 8, 90 S.Ct. at 1307 n. 8.

■ SVC argues that even under the origin of the claim test, the premium paid for the redeemed stock is deductible because the origin of the *premium* was the threats of the redeemed stockholders, *i.e.*, they were forced to repurchase the stock in order to avoid the expected adverse consequences of an involuntary takeover. SVC contends that its "situation is indistinguishable from the situation that was before this Court" in *El Paso Company v. United States*, 694 F.2d 703 (Fed.Cir.1982). The *El Paso* case held that when the Supreme Court ordered divestiture the taxpayer could deduct the expenses incurred in formulating two divestiture plans that were approved by the district court, but set aside by the Supreme Court. *Id.* at 706, 711. The court distinguished *Woodward* and *Hilton Hotels* on the ground that in those cases the decision to complete the transaction was made by management and was not forced by a court's mandate, stating:

> [T]here was no question of a divestiture, and obviously if the transactions had not been seen by management as beneficial, they would have been dropped. They were not measures forced by the judicial power.

*Id.* at 710. Unlike the divestiture in *El Paso*, SVC's decision to redeem its stock was wholly voluntary, a decision it would not have made unless it considered the decision to be in its own best interests. *See Woodward*, 397 U.S. at 579 n. 8, 90 S.Ct. at 1307 n. 8; *Jordan v. Commissioner*, 60 T.C. 872, 879–80 (1973), *aff'd per curiam*, 514 F.2d 1209 (8th Cir.1975).

Under the holding and reasoning of the cited Supreme Court decisions, we conclude that the alleged premium arose from a capital transaction and was treated correctly as such by the Claims Court.

■ C. SVC's alternative claim on the premium issue is that it is entitled to amortize and deduct the alleged premium paid to GDV under section 167(a) of the IRC on the ground that it received a standstill covenant as well as stock. The Claims Court denied this alternative claim because the Agreement did not allocate any part of the payments to the standstill covenant. We agree.

In *Proulx v. United States*, 594 F.2d 832, 839–40, 219 Ct.Cl. 363 (1979), our predecessor court adopted the rule stated in *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir.1967) (*en banc*), that generally a taxpayer may not disregard the terms of a contract allocating the payment thereunder and adopt a different allocation having more favorable tax consequences. *See also Markham & Brown, Inc. v. United States*, 648 F.2d 1043, 1046 (5th Cir.1981). While *Proulx* and *Danielson* related to a covenant not to compete obtained by a buy-

er in connection with its purchase of a business, we consider the facts in this case analogous.

Here, the Agreement states in Section 1 relating to "Purchase and Sale of the Purchase Shares" that the entire amount paid to GDV is "in full payment for the Purchase Shares." Other provisions of the Agreement included the settlement of actions between the parties and the covenant of GDV and City not to acquire any interest in SVC's securities for five years. These are covered in Sections 2 and 5, respectively, but neither section sets forth any separate consideration for these provisions. Thus, no part of the amount to be paid was allocated expressly to the "standstill" covenant in the Agreement.

We have considered all of SVC's arguments on the standstill covenant issue and are not convinced that any part of the monetary consideration should be reallocated to that covenant. *See Markham & Brown, Inc.,* 648 F.2d at 1046 ("repurchaser must prove that the parties mutually intended at the time of repurchase that some part of the lump sum be allocated to the seller's covenant not to compete"). Accordingly, we affirm the Claims Court's holding that SVC is not entitled to amortize over a five year period and deduct under section 167(a) any part of the alleged premium paid to GDV.

AFFIRMED.