**LANE BRYANT, INC. and The Limited, Inc., Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

**No. 92–5022.**

United States Court of Appeals, Federal Circuit.

Sept. 21, 1994.

Michael F. Solomon, Ivins, Phillips & Barker, Washington, DC, argued for plaintiff-appellant. With him on the brief was David M. Weil.

Charles Bricken, Atty., Dept. of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were James A. Burton, Acting Asst. Atty. Gen., Gary R. Allen and Gilbert S. Rothenberg, Attys.

Before RICH, MICHEL, and PLAGER, Circuit Judges.

PLAGER, Circuit Judge.

This tax case arose in the wake of an unsuccessful hostile takeover attempt in the early 1980s. Plaintiff–Appellant Lane Bryant, Inc. and its parent corporation The Limited, Inc.,[1] (Lane) appeal a Court of Federal Claims judgment in favor of Defendant–Appellee the United States, No. 246–89T (Sept. 25, 1991), that Lane was not entitled to a tax refund because no portion of the premium Lane paid to recover its stock from the corporate raiders could be deducted as a business expense, I.R.C. § 162(a),[2] or amortized as a depreciating asset, I.R.C. § 167(a). We *affirm.*

## BACKGROUND

Two related shareholders,[3] Hatleigh Corp. (Hatleigh) and Mico Enterprises, Ltd. (Mico)

---

1. The Limited acquired Lane in May 1982, after the end of the tax year at issue in this case. The Limited filed an amended return and claim for refund on behalf of Lane in 1988.

2. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect during 1981, the tax year at issue.

3. Lane asserts that the two shareholders were acting in concert.

began to accumulate Lane Bryant stock in late 1979 and early 1980. By 1981, the two shareholders owned approximately 20% of Lane's common stock. Lane alleges that Hatleigh and Mico were "threatening to gain control of the company" and that they "harassed, hindered, and disrupted the management and operation" of Lane. Lane further alleges that it accrued costs for legal and proxy solicitation advice as a result of Hatleigh's and Mico's disruptive activities.

On February 4, 1981, in response to this situation, Lane's Board of Directors authorized negotiations with Hatleigh and Mico. Lane wished to recover all Lane stock held by the two shareholders, end all disruptive litigation, and gain a "standstill agreement" under which no stock would be purchased for a given period in the future.[4] Lane reached a negotiated agreement with these shareholders on February 13, 1981;[5] on February 12, Lane stock had closed at $17.625 per share.

Lane's agreements with Hatleigh and Mico are substantially similar in structure. Each contains a provision which allocates certain sums to the acquisition of the stock, and each contains separate provisions relating to other aspects of the agreement. For example, section 1 of the Lane/Mico agreement states that Lane "purchased from [Mico] 206,300 shares of Common Stock of Lane Bryant ... for an aggregate purchase price of $US4,641,750." (This purchase price may be expressed as $22.50 per share, reflecting a repurchase premium of approximately $5.00 per share above the market price.) Other sections provided for cessation of present and future litigation, payment of transfer taxes, warranties of authorization and title, and waiver of dividend rights. No portion of the monetary consideration was specifically allocated to any of those provisions, which we

shall refer to as "non-stock" provisions or items.

Similarly, Section 1 of the Lane/Hatleigh agreement states that "Lane purchased from [Hatleigh] ... 700,900 shares of common stock ... for an aggregate price $16,120,700, or $US23.00 per share." Thus, Lane paid Hatleigh a repurchase premium of approximately $5.50 per share above the going price for its stock.[6] In addition, the agreement provided a separate monetary allocation of "$US175,000 to reimburse [Hatleigh] for a portion of your costs and expenses incurred in the aforesaid litigations."

Like the Mico agreement, the Hatleigh agreement contained separate sections which provided for cessation of present and future litigation, payment of transfer taxes, warranties of authorization and title, and waiver of dividend rights. And like the Mico agreement, no portion of the monetary consideration was allocated to these non-stock provisions. The Hatleigh agreement also contained an additional non-stock item—a "standstill provision" by which Hatleigh agreed not to purchase Lane stock for the following five years. Again, the agreement did not allocate a specific portion of the monetary payment to the standstill provision.

Subsequent to the completion of the stock repurchase deals, Lane sued to recover Hatleigh's short-swing profits under section 16(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78p(b) (1988).[7] (The parties specifically excepted such an action from the otherwise broad litigation waiver.) In brief, this statutory provision provides that an issuer of stock may sue to recover any profits realized from the sale of that stock within six months of its purchase, if the sale was by an individual owning more than 10% of the stock. In the course of the short-

---

4. The Lane Board of Directors explicitly authorized negotiation of a standstill agreement with Hatleigh, but not with Mico. Lane alleges that this is because the Board did not think an agreement with Mico was necessary "because, based on Mico's passive role as an investor and because of its implicit partnership with Hatleigh ... by obtaining the Hatleigh standstill, it effectively obtained the same from Mico."

5. The chairman of Hatleigh represented both shareholders in the negotiations.

6. Lane alleges that the $0.50 per share in excess of the Mico price was intended to "reimburse partially Hatleigh for its potential liability for short swing profits under Section 16(b) of the Securities and Exchange Act of 1934."

7. Since Mico had not purchased Lane stock within the six months preceding the sale, Mico had no liability under section 16(b) of the 1934 Act.

swing profit litigation, the parties stipulated that Lane had paid Hatleigh $23.00 per share (and paid Mico $22.50 per share) *for the stock.* The District Court entered a $649,687.50 judgment in favor of Lane, based upon its understanding that the shares had been sold for $23.00 per share. *Lane Bryant Inc. v. Hatleigh Corp.,* 517 F.Supp. 1196, 1198 (S.D.N.Y.1981).

The tax consequences of these events came into focus when Lane filed its tax return for its taxable year ending January 30, 1982. Lane took a $5,299,730 deduction in that return, claiming that the $5.00 per share premium paid to Mico and the $5.50 per share paid to Hatleigh were for the non-stock items rather than for the stock itself, and hence could be deducted as "ordinary and necessary business expenses." I.R.C. § 162(a). The IRS disallowed that deduction in 1986, offset the lost deduction with various other items, and arrived at a net deficiency of $2,090,605. Lane paid that deficiency in March 1987 and filed an amended return seeking a refund in 1988, arguing that the repurchase premiums were properly deducted under I.R.C. § 162(a) or, in the alternative, were amortizable assets. I.R.C. § 167(a). The IRS was unmoved by either theory.

Lane filed suit in the Court of Federal Claims, arguing that the IRS had incorrectly denied Lane's deductions and that it therefore was entitled to a refund. On September 24, 1991, the Court of Federal Claims heard oral argument on the government's motions for summary judgment and for sanctions under Rule 11. At close of oral argument, the Court of Federal Claims denied the motion for sanctions and by written order granted the motion for summary judgment.

The Court of Federal Claims summarized the facts described above, set forth the relevant provisions of the Hatleigh and Mico agreements, and concluded:

> Neither the Hatleigh agreement nor the Mico agreement made any allocation of the aggregate amount paid to Lane Bryant as to any of the non-stock items plaintiffs identify as the basis for a premium. There

is no allocation for an amount paid for the "standstill" agreement.

*Ct.Fed.Cl.Op.* at 3. Since no consideration had been allocated to the non-stock items, there was nothing for Lane to deduct or amortize. The court acknowledged Lane's argument that the premium was *intended* as payment for the non-stock items, but concluded that in the "absence of a specific allocation for the non-stock items, the 'intent' of the contracting parties is irrelevant." *Id.* at 4–5. The court followed the so-called *Danielson* rule,[8] discussed *infra,* which essentially requires that the tax effects of an agreement flow strictly from the agreement *as written. Id.* at 5.

Lane attempted to avoid the *Danielson* rule by arguing that it barred repudiation of clear allocations, but was inapplicable in the case of "lump-sum" purchase agreements with no clear allocation of monetary consideration. Assessment of the tax effects of such lump-sum agreements would require an inquiry into the allocative intent of the parties. *See KFOX, Inc. v. United States,* 206 Ct.Cl. 143, 510 F.2d 1365, 1370 (1975). Lane argued that its agreements with Hatleigh and Mico were such lump-sum agreements, the per share price in section 1 of each agreement being only a "convenient shorthand description of the aggregate bargained-for consideration." Lane further argued that the agreements did not contain a more accurate allocation of the consideration "because time did not permit such fine detail."

The Court of Federal Claims considered and rejected Lane's argument that the agreements were lump-sum agreements for which Lane could introduce evidence of allocative intent:

> The agreements, however, do specifically allocate the aggregate amounts paid to the purchasers to the shares of stock redeemed. *Plaintiffs could hardly have done a better job allocating the entire purchase price to the stock* in the Hatleigh and Mico agreements.... Under *Danielson,* plaintiffs cannot disavow the allocation of

---

8. *Commissioner v. Danielson,* 378 F.2d 771 (3d Cir.) (*en banc*), *cert. denied,* 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967).

the entire purchase price [to] the stock redeemed in the agreement with Hatleigh. *Id.* at 6 (emphasis added) (alteration in original). The Court of Federal Claims concluded that summary judgment was appropriate, and entered judgment in favor of the Government. Lane appeals that judgment.

## DISCUSSION

■ Upon review of a grant of summary judgment, all evidence is to be viewed in a light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of the nonmoving party. Summary judgment is properly granted when no material facts are in dispute and the prevailing party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Armco, Inc. v. Cyclops Corp.*, 791 F.2d 147, 149, 229 U.S.P.Q. 721, 722 (Fed.Cir.1986).

Here, the case arises from the disparity between the going market price of Lane shares and what Lane paid Mico and Hatleigh for their shares—$5.00 and $5.50 per share above market, respectively. Lane argues that "a portion of the aggregate price paid over the fair market value of the shares represented consideration paid for (1) the standstill agreement, (2) the agreements to terminate litigation, and (3) the releases from liability." Lane does not claim that that is what the agreement *says*—instead, Lane argues that that is what the parties *meant.* Since Lane sees a genuine factual issue as to the allocative intent of the parties, it argues that summary judgment for the Government was improvidently granted.

■ Only factual issues of legal relevance preclude summary judgment. Here, the Court of Federal Claims believed that the parties' allocative intent was legally irrelevant because the *Danielson* rule required that tax consequences flow from the agreement as written, not from later allegations of what was intended by the contracting parties. Thus, in order to determine whether summary judgment was properly granted, we must determine whether the Court of Federal Claims correctly invoked the *Danielson* rule.

### A.

■ The *Danielson* rule takes its name from *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir.) (*en banc* ), *cert. denied* 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). At issue were the shareholders' tax consequences when their loan company was bought out by another. The sales agreement included a covenant not to compete, toward which $152 per share of the $374 per share sale price was allocated. *Id.* at 773. The tax dispute arose when the taxpayer reported the entire sale price of $374 per share as proceeds from the sale of capital assets, to be taxed at capital gains rates. The Commissioner instead ruled that the $152 per share allocated to the noncompetition covenant was to be taxed as ordinary income. The Tax Court ruled in favor of the taxpayers, reasoning that the taxpayers had proven that the covenants were not bargained for and that the entire consideration was in reality for the stock. *Id.* at 774. The Third Circuit reversed the Tax Court, and in so doing created the *Danielson* rule:

> [A] party can challenge the tax consequences of his agreement ... only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.

*Id.* at 775. The rule was expressly adopted by our predecessor Court of Claims. *Proulx v. United States*, 219 Ct.Cl. 363, 594 F.2d 832, 839 (1979); *Dakan v. United States*, 203 Ct.Cl. 655, 492 F.2d 1192, 1199 (1974).[9]

The *Danielson* rule recently was applied in assessing the tax consequences of a stock repurchase agreement which averted a hostile corporate takeover—the factual scenario before us here. In *Stokely–Van Camp Inc. v. United States*, 974 F.2d 1319 (Fed.Cir. 1992), Stokely–Van Camp (SVC) paid a premium to repurchase stock from a disruptive shareholder. As in the Lane agreements, the SVC repurchase agreement also provided for cessation of disruptive litigation and for a standstill covenant. *Id.* at 1323. Like Lane,

---

9. Precedent from the Court of Claims is binding upon this court. *South Corp. v. United States,* 690 F.2d 1368, 1370, 215 U.S.P.Q. 657, 658 (Fed.Cir.1982).

SVC later sought to deduct or amortize the repurchase premiums.

The *Stokely* court was required to consider the reach of *Danielson* because it found that the SVC repurchase agreement contained an express allocation of monetary consideration. *Id.* at 1326. Since the court considered the standstill covenant to be analogous to the noncompetition covenants in *Proulx* and *Danielson*, it applied the *Danielson* rule to preclude SVC's attempt to reallocate a portion of the consideration to the standstill covenant. *Id.* at 1325–26.

In light of *Stokely*, it is clear that the *Danielson* rule is the governing rule in the Federal Circuit and may properly be applied to stock repurchase agreements which contain express allocations of monetary consideration between stock and non-stock items.[10] Whether it was properly applied in this case, then, depends on whether the Hatleigh and Mico agreements contained such an express allocation.

### B.

■ Lane argues here, as it did before the Court of Federal Claims, that the Hatleigh and Mico agreements are merely lump-sum agreements expressed in the convenient shorthand of dollars per share. Lane explains that since the agreement is silent as to the amount of monetary consideration allocated to the non-stock items, an inquiry into the allocative intent of the parties is required. The Government in turn argues that all the money was expressly allocated to purchase of the stock, so by implication zero was allocated to the non-stock items.

The Court of Federal Claims interpreted the contract to contain an express allocation of *all* the money to the stock, and *none* to the non-stock items. We agree. As explained above, both the Mico and the Hatleigh contracts contain a separate clause regarding sale of the stock. *All* financial consideration is allocated in that clause, in exchange for the stock. As a simple matter of mathematics, that means that *no* money is left over to allocate toward the non-stock items. This

reading is consistent with the interpretation given to the agreement during Lane's short-swing profit suit against Hatleigh.

Our conclusion that the Hatleigh and Mico agreements mean exactly what they say is further bolstered by the similarities of those agreements and the sales agreement at issue in *Stokely*. Like the Lane agreements, SVC's agreement with its dissident shareholder did not expressly indicate that *no* money was allocated to the non-stock items. Nevertheless, the *Stokely* court found that to be the obvious implication:

> Here, the Agreement states in Section 1 relating to "Purchase and Sale of the Purchase Shares" that the entire amount paid to GDV is "in full payment for the Purchase Shares." Other provisions of the Agreement included the settlement of actions between the parties and the [standstill] covenant.... These are covered in Sections 2 and 5, respectively, *but neither section sets forth any separate consideration for these provisions. Thus, no part of the amount to be paid was allocated expressly to the "standstill" covenant in the Agreement.*

*Id.* at 1326 (emphasis added). This passage, and in particular the highlighted phrase, demonstrates that *Stokely* is factually indistinguishable from the situation before us. Lane's agreements with Hatleigh and Mico expressly allocate nothing to the non-stock provisions.

### C.

■ Lane argues that interpreting the Hatleigh and Mico agreements as allocating nothing to the non-stock items is "illogical" and flies in the face of "economic sense." Lane alleges that the agreements arose because it sought certain non-stock items, repurchase of the outstanding stock being merely a vehicle to that end. Lane thus concludes that the repurchase premium could *only* be allocated to the non-stock items. But Lane does not offer any explanation

---

**10.** Lane makes much of a final paragraph of the *Stokely* opinion which rejects SVC's "other arguments" and cites a case from another circuit which accepted evidence of the parties' mutual intent. *Markham & Brown, Inc. v. United States,* 648 F.2d 1043 (5th Cir.1981). Lane reads this passing reference as an adoption of that circuit's "mutual intent" rule. To the contrary, we read this as merely a rejection of SVC's attempt to avoid the clearcut result of the *Danielson* rule.

(beyond passing reference to the brevity of negotiations) as to why the contracts were not drafted to reflect the "economic reality" which Lane finds so obvious now. Certainly it was not due to lack of legal counsel or business sophistication.

■ Although acquisition of non-stock items might have been a necessary condition for the deal, subsequent allocation of the monetary consideration is a different matter. When stock and non-stock items are eligible for differential tax treatment, the parties' allocation presumably reflects their allocation of anticipated tax benefits and burdens. *Danielson,* 378 F.2d at 775. Giving strict credence to that presumption aids the tax collector in avoiding the whipsaw of later inconsistent positions by those parties. *Id.* That one of the parties later sees tax benefits to be reaped from some other allocation is irrelevant. *Proulx,* 594 F.2d at 840 (quoting *Hamlin's Trust v. Commissioner,* 209 F.2d 761, 765 (10th Cir.1954)).

In sum, the *Danielson* rule requires that we take the allocation made by the parties at face value for tax purposes, regardless of what we might think of the "economic realities" which drove the deal. *Compare Schulz v. Commissioner,* 294 F.2d 52, 55 (9th Cir. 1961).

### CONCLUSION

Lane has not shown that the Court of Federal Claims erred in applying the *Danielson* rule to the situation before us. There were no genuine factual issues in dispute, and the Court of Federal Claims properly granted summary judgment for the Government.

*AFFIRMED.*