**WRANGLER APPAREL CORP., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

No. 2:94cv481.

United States District Court, M.D. North Carolina, Greensboro Division.

July 22, 1996.

Norwood Robinson, Winston–Salem, NC, Herbert O'Dell, Washington, DC, for plaintiff.

Donald Gavin, Washington, DC, Department of Justice, for defendant.

## MEMORANDUM OPINION

BEATY, District Judge.

This matter is before the Court on Plaintiff and Defendant's Motions for Summary Judgment.

## I. FACTUAL BACKGROUND

This is an action for a tax refund of $17,730,600 based upon an alleged "greenmail" payment made in connection with the purchase of common stock. Plaintiff, Wrangler Apparel Corp., merged with Blue Bell, Inc. ("Blue Bell") and has assumed Blue Bell's tax refund claim, though the events which give rise to this refund claim occurred while Blue Bell was an independent entity.

From 1981 to November 1983 various entities controlled by the Bass family of Fort Worth, Texas ("Bass Group") began purchasing Blue Bell stock. By November 1983 the Bass Group had acquired 2,981,600 shares equaling a 23.4 percent interest in Blue Bell's total shares outstanding. Blue Bell's management viewed the Bass Group as a corporate raider intent upon taking over the company. In order to end the Bass Group's disruptive presence, Blue Bell's management decided to eliminate the group's ownership interest in the company.

Blue Bell offered to purchase the shares held by the Bass Group, and the parties executed a Stock Purchase Option Agreement ("SPOA") on November 17, 1983. The SPOA provided that the Bass Group would sell all of its Blue Bell shares in a two-step process and would not purchase any additional shares for a period of ten years. Under the first paragraph of the SPOA, Blue Bell agreed to purchase 1,898,100 of its shares held by the Bass Group "at a purchase price equal to $50.00" per share. These shares were identified as the "Initial Shares" in the agreement.

The SPOA also granted Blue Bell an option to purchase the remaining 1,083,500 shares held by the Bass Group during the option period of March 23–31, 1984 "at a purchase price equal to $50.00" per share. These shares were identified as the "Option Shares" in the agreement. The SPOA further provided that if Blue Bell did not exercise its option, then the Bass Group would have the right to repurchase the Initial Shares previously redeemed by Blue Bell.

The SPOA contained a standstill provision which stated that if Blue Bell exercised its option and purchased the Option Shares, the

Bass Group would be prohibited from purchasing Blue Bell stock for a period of ten years. After the parties executed the SPOA, Blue Bell purchased the Initial Shares from the Bass Group for $90,130,867.05 which was paid in cash and with a promissory note. At the price of $50 per share the 1,898,100 Blue Bell shares held by the Bass Group were worth $94,905,000. The Bass Group returned $4,774,132.95 to Blue Bell which reflected the amount by which the $50 per share price exceeded the Bass Group's acquisition costs for the shares within the last six months. This payment by the Bass Group was made pursuant to Section 16(b) of the Securities and Exchange Act of 1934 which requires that a shareholder with a 10 percent interest in a company return any profits to the company that were earned during a six month period on the purchase or sale of the company's stock. This profit is referred to as a "short swing" profit. *See Blau v. Lehman*, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); 15 U.S.C. § 78p (1981).

At the time of Blue Bell's purchase, the mean trading price of Blue Bell's stock was $35.9375 per share. At this price the 1,898,-100 Initial Shares had a value of $68,212,-968.75, thus Blue Bell paid the Bass Group an excess of $21,917,898.30 for the Initial Shares over the trading value of the stock.

Subsequently, on March 30, 1984 Blue Bell exercised its option under the SPOA and purchased the remaining 1,083,500 shares held by the Bass Group for $54,175,000 in cash. At the time of this purchase, the mean trading price of Blue Bell's stock was $36.375 per share. Blue Bell thus paid the Bass Group an excess of $14,762,687.50 for the Option Shares over the trading value of the stock. After the two transactions had been completed, Blue Bell had paid a total of $36,680,585.80 over the trading price of its shares to the Bass Group.

Plaintiff contends that this $36,680,585.80 payment is "greenmail" which it defines in its complaint as "an amount paid to a corporate raider not to acquire stock held by the raider, but to eliminate the raider's threat to the company's business." Plaintiff's Complaint, ¶ 6. Plaintiff asserts that Blue Bell paid this greenmail in order to eliminate any further threats to the company by the Bass Group and to obtain the standstill provision in the SPOA. Plaintiff contends that the greenmail payment should be tax deductible or amortizable over time. After the Internal Revenue Service denied Plaintiff any tax deduction or loss for the greenmail payment, Plaintiff brought this action for a tax refund.

The Government has moved for partial summary judgment and argues that as a matter of law Plaintiff is not entitled to any of its claimed tax deductions or losses in connection with the alleged greenmail payment. Plaintiff has filed a protective motion for partial summary judgment which provides that if the Government's motion is granted, then Plaintiff is entitled to a tax deduction for unstated interest. This interest relates to the promissory note Blue Bell gave the Bass Group in connection with its purchase of the Initial Shares. Plaintiff states that if the Government's motion for summary judgment is denied, then its motion for unstated interest is moot.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination the court views the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.3d 53, 56 (4th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). A motion for summary judgment should not be granted " 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assoc., Inc.*, 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir.1967)).

## III. GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Government's Motion for Partial Summary Judgment presents the question of

whether the Bass Group and Blue Bell intended to allocate any of the purchase price for Blue Bell's stock to the standstill provision in the SPOA. Plaintiff argues that Blue Bell made a greenmail payment in exchange for the Bass Group's agreement in the standstill provision not to acquire Blue Bell stock or otherwise attempt to gain control of Blue Bell for a period of ten years. The Government contends, however, that Plaintiff is not entitled to a tax refund because the parties did not allocate any portion of the purchase price in the SPOA to the standstill provision. The Government argues that since none of the money Blue Bell paid for its stock was allocated to the standstill provision, the transaction is simply a redemption of Blue Bell's stock which is a non-deductible capital expenditure under Internal Revenue Code ("I.R.C.") § 263 and cannot be amortized under I.R.C. § 167.

In its complaint, Plaintiff presents two primary reasons why it is entitled to a tax refund for the alleged greenmail payment. First, Plaintiff contends that the alleged greenmail payment is a tax deductible business expense under I.R.C. § 162. Alternatively, Plaintiff asserts that it is entitled to amortize any portion of the alleged greenmail payment that is allocable to the standstill provision over the provision's useful life under I.R.C. § 167. The Government asserts in its Motion for Partial Summary Judgment that Plaintiff cannot deduct what it contends is a greenmail payment under I.R.C. § 162 nor amortize it over time under I.R.C. § 167. The Court will now address the Government's arguments in turn.

A. Deduction under I.R.C. § 162

 Section 162 provides for the deduction of all ordinary and necessary business expenses. The Government argues that the alleged greenmail payment cannot be deducted under § 162 as an ordinary and necessary business expense because the payment instead was made in conjunction with the acquisition of a capital asset, i.e. Blue Bell stock. In *Woodward v. Commissioner*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970) the Supreme Court adopted the "origin of the claim" test for determining wheth-

er an expenditure is ordinary in nature and entitled to a deduction or whether it is a capital expenditure which is not entitled to a deduction. Under the "origin of the claim" test, costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures. *Woodward,* 397 U.S. at 575, 90 S.Ct. at 1305. The motivation of the taxpayer in the acquisition or disposition of a capital asset is irrelevant. *Arkansas Best Corp. v. Commissioner,* 485 U.S. 212, 223, 108 S.Ct. 971, 978, 99 L.Ed.2d 183 (1988).

The Government cites *Stokely–Van Camp Inc. v. United States,* 974 F.2d 1319 (Fed.Cir. 1992) which is factually similar to the present case. In *Stokely.* the taxpayer corporation paid a premium to three shareholders to redeem its stock. *Id.* at 1323. As part of the transaction the shareholders agreed to a standstill provision whereby they would not acquire any stock or other security in the corporation for five years. *Id.* The corporation argued that it was entitled to deduct the premium it paid for the stock under § 162. The Court found, however, that since the premium was paid in connection with the purchase of the corporation's stock, a capital asset, the premium was not deductible as a business expense. *Id.* at 1325.

In the present case, Blue Bell asserts that it paid greenmail as part of its consideration for the purchase of its stock held by the Bass Group. This alleged greenmail payment was thus made in connection with the purchase of a capital asset and is not deductible as a business expense under I.R.C. § 162. Therefore, the Government's Motion for Summary Judgment as to this issue is GRANTED.

B. Amortization under § 167

 Section 167 provides a depreciation deduction for property used in a trade or business. The Government argues that Plaintiff is not entitled to amortize or depreciate any portion of the alleged greenmail payment which it seeks to allocate to the standstill provision under § 167. The Government asserts that since Blue Bell and the Bass Group did not specifically allocate any portion of the purchase price to the standstill provision, Plaintiff should not be allowed to

make such an allocation *nunc pro tunc* in order to receive a tax deduction.

In support of its argument the Government cites *Lane Bryant Inc. v. United States,* 35 F.3d 1570 (Fed.Cir.1994). In *Lane Bryant,* the taxpayer corporation redeemed all of its shares from two large shareholders that had threatened to gain control of the company. *Id.* at 1572. The corporation, Lane, entered into an agreement with the two shareholders which provided that Lane would repurchase all the shares at a premium over the market value. *Id.* The agreement also contained a standstill provision barring the stockholders from buying Lane's stock for a period of time. *Id.* The agreement did not specifically allocate the monetary consideration paid by Lane between the stock and standstill agreement. Lane claimed the premium it paid as a tax deduction which the Internal Revenue Service denied. In affirming this determination, the Federal Circuit relied upon the *Danielson* rule established by the Third Circuit in *Commissioner v. Danielson,* 378 F.2d 771 (3d Cir.) *(en banc), cert. denied,* 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967) which provides:

> [A] party can change the tax consequences of his agreement ... only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.

*Lane Bryant,* 35 F.3d at 1574 (quoting *Danielson,* 378 F.2d at 775).

The Court found that the agreement between Lane and the shareholders contained separate clauses regarding the sale of stock and standstill provision. *Id.* at 1575. All of the monetary consideration was allocated to the sale of stock which left nothing to allocate toward the standstill provision. *Id.* Under the *Danielson* rule the terms of the agreement are controlling, therefore, the Court held that the agreement expressly allocated all of the consideration to the stock and nothing to the standstill provision. *Id.* Accordingly, Lane was not entitled to a tax deduction for the premium it paid for its stock. *Id.* at 1576.

The Fourth Circuit, however, has not adopted the *Danielson* rule. *Lambert v. United States,* 409 F.Supp. 1015, 1018 (W.D.Va.1976); *Elrod v. Commissioner,* 87 T.C. 1046, 1065, 1986 WL 22052 (1986). Instead, when addressing the tax consequences of a transaction the Court applies a two-prong test which examines (1) the intent of the parties; and (2) the economic substance of the transaction. *General Insurance Agency, Inc. v. Commissioner,* 401 F.2d 324 (4th Cir.1968). In *General Insurance,* the Court analyzed a transaction which involved a sale of an insurance agency together with a covenant not to compete. *Id.* at 327. If the covenant was separately bargained for as part of the transaction, then the buyer would be entitled to amortize the covenant over time under I.R.C. § 167. *Id.* at 329. On the other hand, if the covenant was merely incidental to the transaction the buyer would not be entitled to a tax deduction. *Id.*

To determine whether the parties intended the sale of the agency and purchase of an accompanying covenant not to compete, the Court also examined the economic reality of the transaction. The Court held:

> [T]he determination of whether a part of the purchase price represents payment for a non capital item, i.e., a covenant not to compete, depends upon whether the parties to the agreement intended to allocate a portion of the purchase price to such covenant at the time they executed their formal sales agreement. It is necessary also to establish that the covenant "have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement."

*Id.* at 330 (footnote omitted) (quoting *Schulz v. Commissioner,* 294 F.2d 52, 55 (9th Cir. 1961)). The determination of the parties' intent and the economic substance of the transaction is a question of fact with the taxpayer bearing the burden of proving he is entitled to the deduction. *Id.* at 329.

The *General Insurance* test was applied by this Court in *Robins & Weill, Inc. v. United States,* 382 F.Supp. 1207 (M.D.N.C.

1974). In *Robins* the taxpayer corporation had purchased insurance accounts and covenants not to compete from two insurance agencies. *Robins*, 382 F.Supp. at 1208. The corporation paid a lump sum for the accounts and covenant, and the parties did not allocate the consideration between the two items. *Id.* at 1215–16. The corporation attempted to show the value of the accounts and covenants through a method of calculation that was common in the insurance industry. *Id.* at 1216. The Court found, however, that accepting such an analysis would be contrary to the *General Insurance* test which requires that "the parties to the agreement *intend* to allocate a portion of the purchase price to such covenant or expiration [insurance account] *at the time they execute their formal sales agreement." Id.* One of the parties in *Robins* admitted that the parties did not contemplate allocating a portion of the purchase price when they executed their agreement. *Id.* at 1217. Since the parties did not allocate the consideration when they executed the agreement, the Court held that the corporation was not entitled to a tax refund. *Id.* at 1218.

The *General Insurance* test has also been applied in a case involving the valuation of a sale of stock together with a covenant not to compete. In *Furman v. United States*, 602 F.Supp. 444 (D.S.C.1984), *aff'd*, 767 F.2d 911 (4th Cir.1985), the plaintiffs sold the stock of their insurance agency together with several covenants not to compete. *Furman*, 602 F.Supp. at 448. The parties had specifically allocated separate consideration for the stock and the covenants, thus the intent prong of the *General Insurance* test was satisfied. *Id.* at 456. The Court then addressed the economic substance prong and found that significant consideration had been allocated to the covenants not to compete. *Id.* at 457. The Court also found that the plaintiffs had obtained life insurance in order to protect the value of the covenants in the event one of them died prior to the execution of the agreement. *Id.* Therefore, the Court concluded that the covenants possessed economic substance and satisfied the second prong of the *General Insurance* test. *Id.*

It is clear that the first prong of the *General Insurance* test requires that the parties intend to allocate a portion of the purchase price to the covenant at the time they execute their agreement. *General Insurance*, 401 F.2d at 329. In the instant case, Blue Bell paid a lump sum to the Bass Group for Blue Bell's stock and the standstill provision. However, the parties' agreement, the SPOA, makes no specific allocation of this consideration between the stock and standstill provision. The Government contends that Blue Bell and the Bass Group did not intend to allocate the consideration, thus the transaction does not satisfy the intent element of the *General Insurance* test.

Plaintiff responds, however, that the intent element is satisfied since the parties recognized as a part of the negotiations that the standstill provision was a valuable asset and that consideration was being paid for it. After reviewing the summary judgment record, the Court finds that there are material issues of fact regarding the parties' intent, thereby precluding entry of summary judgment for the Government.

While the SPOA does not specifically allocate the consideration between the stock and the standstill provision, Plaintiff has provided evidence that the parties intended some allocation. Plaintiff has submitted the affidavits of a member of Blue Bell's Board of Directors, Bland W. Worley, and Blue Bell's president and chief executive officer, Edward J. Bauman. Mr. Worley and Mr. Bauman both testified that Blue Bell would not have entered into the SPOA without the standstill provision. Mr. Bauman stated:

> Blue Bell would not have paid in excess of the market price just to acquire its stock from the Bass Group. We were advised that the standstill agreement, which was very valuable to Blue Bell, was a reason why the transaction could appropriately be consummated with the Bass Group where the total amount paid exceeded the trading price of the shares acquired. This premium was paid for the standstill agreement.

Affidavit of Edward J. Bauman, ¶ 7.

The Government counters this evidence with the deposition of Chester Carlock, the

Bass Group's accountant during the transaction. Mr. Carlock testified as follows:

Q. Is it further correct that when one looks at the stock purchase and option agreement which is marked as Exhibit 1, that this agreement does not allocate any of the purchase price in specific terms to the standstill provisions which are in paragraph 6?

A. That's my understanding.

Carlock Deposition, 33.

The contracting parties' intent is a question of fact. If there is more than one permissible inference as to the parties' intention, then the question is a triable issue of fact. *Bear Brand Hosiery Co. v. Tights, Inc.*, 605 F.2d 723, 726 (4th Cir.1979). The Court finds that Plaintiff's evidence is sufficient to raise an issue of material fact as to whether Blue Bell and the Bass Group intended to allocate a portion of the purchase price to the standstill agreement. The *General Insurance* test does not require the parties to place their specific allocation of the purchase price in the agreement, instead the test just requires that the parties intend to allocate at the time they execute the agreement. *General Insurance*, 401 F.2d at 329; *see also Moscowitz v. United States*, 314 F.Supp. 926, 929 (E.D.Mo.1970) (Where there is a dispute between the parties to the agreement with respect to the allocation of a covenant not to compete, summary judgment is inappropriate).[1]

Since the Court has determined that a question of fact exists as to the first part of the *General Insurance* test, it is not necessary to fully discuss the economic substance part of the test. However, since this matter may be raised in the future, the Court will address this issue. The second prong of the *General Insurance* test requires

that the covenant bargained for have some independent value grounded in economic reality. *General Insurance*, 401 F.2d at 330. In the present case, the parties do not dispute that the standstill provision was highly valued by Blue Bell. After the Bass Group sold all of its Blue Bell stock to the company, the standstill provision operated to bar the Group from purchasing Blue Bell stock for a period of ten years. For the purposes of the Government's Motion for Partial Summary Judgment, the Court finds that the standstill provision possessed economic substance, therefore, the second prong of the *General Insurance* test would be satisfied based upon the facts in this case.

Accordingly, the Court concludes that Plaintiff is entitled to show that Blue Bell and the Bass Group intended to allocate some specific portion of the purchase price to the SPOA. The Government's Motion for Partial Summary Judgment on this issue is therefore DENIED.

## IV. PLAINTIFF'S PROTECTIVE MOTION FOR SUMMARY JUDGMENT

Plaintiff has filed a Protective Motion for Summary Judgment which states that if the Government's Motion for Partial Summary Judgment is granted, then Plaintiff is entitled to unstated interest on the promissory note Blue Bell gave the Bass Group in connection with its purchase of the Initial Shares. Since the Court has denied the Government's motion, Plaintiff's motion is therefore moot.

## V. CONCLUSION

With respect to Plaintiff's alternative bases for a tax refund related to the transaction with the Bass Group, the Court finds that Plaintiff is not entitled to deduct the alleged greenmail payment to the Bass Group as a

---

1. An issue at trial may be whether the parties mutually agreed on specifically how much of the consideration to allocate between the stock and the standstill provision at the time they executed the SPOA. One caveat that may exist for the Plaintiff is that a taxpayer, after negotiating a transaction with an adverse party, may not restructure the unfavorable attributes of the agreement for tax purposes. *Furman*, 602 F.Supp. at 455. To permit one taxpayer to unilaterally modify the terms of a bargain would encourage parties to ignore their agreements in the hope that the courts will give them more advantageous tax treatment. *Id.* Such a result would allow the parties to enjoy tax benefits due to inconsistent reporting of the same transaction. *Id.* This issue of mutual intent, however, does not need to be addressed at this stage of the proceedings, since the only issue reached is whether there is a question of fact as to the intent of Blue Bell and the Bass Group to allocate a portion of the consideration in the SPOA to the standstill provision.

427

business expense under I.R.C. § 162. The Government's Motion for Partial Summary Judgment on this issue is therefore GRANTED.

The Court further finds that there is a material issue of fact as to whether Blue Bell and the Bass Group intended to allocate any of the greenmail payment to the standstill provision when the parties executed the SPOA. The Government's Motion for Partial Summary Judgment on this issue is therefore DENIED. Plaintiff's Protective Motion for Summary Judgment is DENIED as moot.